# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

KAREN E. KEELER,

       **Plaintiff,**

vs.                                        Case No. 8:05-CV-1463-T-27TBM

FLORIDA DEPARTMENT OF HEALTH,

       **Defendant.**

_____/

## ORDER

**BEFORE THE COURT** is Defendant's Motion for Summary Judgment (Dkt. 31) and

Plaintiff's Response in Opposition (Dkt. 41). Upon consideration, Plaintiff has failed to establish a

*prima facie* case of discrimination based on her disabilities pursuant to the ADA.  Accordingly,

Defendant's motion for summary judgment is **GRANTED**.

### Factual Background

Plaintiff Karen Keeler was employed as a records technician by the Florida Department of

Health ("FDOH") from approximately September 19, 2003 to December 9, 2004. (Keeler Depo., pp.

21,187). Plaintiff's direct supervisor was Mae Harper. (Keeler Depo., p. 24). Harper's supervisor

was Bonnie Cain. (Keeler Depo., p. 25). Cain's supervisor was Alan Shaffren. (Keeler Depo., p.

25).  Plaintiff alleges that during her employment, Defendant failed to transfer her to a less stressful

position as an accommodation for her disabilities and retaliated against her in violation of the

1

Americans with Disabilities Act ("ADA"). (Dkt. 1).[1]

On September 15, 2004, after overhearing co-workers discuss a possible vacant position, Plaintiff handed Bonnie Cain a post-it note with the message: "Bonnie, I want out, transfer me to her job, Karen." (Keeler Depo., p. 27; Ex. G).[2] Shortly after handing Cain the note, Plaintiff met with Cain in her office. (Keeler Depo, p. 28). Plaintiff told Cain that she "wanted to move out of [her current] position because of the volume of work, and the amount of stress that it was putting on [her]." (Keeler Depo., p. 28).

During the meeting, Plaintiff asked to be considered for an available Senior Clerk position and told Cain she did not mind that the transfer would be a demotion. (Keeler Depo., p. 28). Plaintiff told Cain her current position was "taking its toll on [her] physically" because she was "forced to

---

[1] This Court has denied Plaintiff's February 2008 request to add claims that Defendant violated her First Amendment rights, deprived her of civil rights pursuant to 42 U.S.C. § 1983, violated the Rehabilitation Act of 1973, violated the Fair Labor Standards Act. (Dkts. 30, 39). In her Complaint, she alleges that this action "is based on retaliation . . . [and] on failure to uphold the laws set forth by the [ADA]." (Dkt. 1, p. 1). Title I of the ADA governs employment discrimination. *See Bledsoe v. Palm Beach Co. Soil and Water Conservation Dist.,* 133 F.3d 816, 23 (11th Cir.1998). While Plaintiff cites no authority for her contention that Title II of the ADA applies to her claims, the Eleventh Circuit has held that Title II may encompass employment discrimination claims against a pubic entity. *See Bledsoe,* 133 F.3d at 822-23. Regardless of Title II's application, however, Title I provides the law applicable to Plaintiff's claims. *See Pickering v. City of Atlanta,* 75 F. Supp. 2d 1374, 1378 (N.D.Ga. 1999) ("Although plaintiff asserts her claim under Title II of the ADA, which governs discrimination by public entities, Title I provides the applicable law with respect to employment discrimination actions.") (citing 28 C.F.R. § 35.140(b)(1) and *Bledsoe,* 133 F.3d at 822-23).

Additionally, Plaintiff cites Title IV in support of her Eleventh Amendment argument. (Dkt. 41, p. 3). This Court previously addressed whether Defendant is immune from liability and concluded that it is immune from claims for monetary damages brought pursuant to Title I. (Dkt. 18, p. 2). Accordingly, this Court will consider Title IV solely as it relates to Plaintiff's retaliation claims. *See* 42 U.S.C. § 12203(a) (Title IV "Prohibition against Retaliation and Coercion").

[2] Defendant has not authenticated the deposition exhibits submitted in support of its motion for summary judgment by separate affidavit, although they appear to qualify as business records of Defendant. Plaintiff has not objected to consideration of the documents, most of which are documents from Plaintiff's personnel file and many of which she acknowledged and addressed during her deposition. The requirement of authentication is subject to waiver if it is not raised before the trial court by the opposing party. *See United States v. Monkey,* 725 F.2d 1007, 1011 n. 4 (5th Cir. 1984)

squeeze in nine hours of work into an eight-hour day" and "none of [the record technicians] were sufficiently trained." (Keeler Depo., pp. 28-30). According to Plaintiff, she cried during the meeting. (Keeler Depo., p. 28). In response, Cain told Plaintiff her work was "fine" and that she "[didn't] want to hear it." (Keeler Depo., p. 29). According to Plaintiff, Cain "took offense to the fact that [Plaintiff] reiterated several times that [her] unit was having to work far more than what would normally be expected of the record technicians." (Keeler Depo., p. 30).

In an email to Cain dated September 16, 2004, Plaintiff again expressed an interest in the Senior Clerk position and mentioned that she was open to other positions, including part-time work. (Keeler Depo., Ex. G). Plaintiff stated "[t]he stress and volume (regardless of it's [sic] simplicity) of work expected from this position is more often than not, overwhelming." *Id.*

On September 17, 2004, Plaintiff sent another email to Cain following-up on her previous email requesting a transfer. (Keeler Depo., Ex. H). In her September 17, 2004 email, Plaintiff stated that she is "capable of maintaining [her] position for an extended period of time just encase [sic] you have an alternative position that you would prefer me in as opposed to the senior clerk position." (Keeler Depo, Ex. H).[3]   Plaintiff had not disclosed her disabilities to anyone at work at the time she sought a transfer to a lower position. (Keeler Depo., p. 44).

According to Plaintiff, Cain told her that her transfer request was denied because "Alan [Shaffren] doesn't like to demote his employees, and . . . they [thought] that [Plaintiff was] doing fine . . ." (Keeler Depo., p. 64). Plaintiff told Cain that she was going to seek outside employment because she "was a sinking ship" in her current position. (Keeler Depo., p. 65). According to

---

[3] Plaintiff also expressed concern that she might lose out on a $1,000 bonus which Harper told her she would receive in December. (Keeler Depo, Ex. H).

Plaintiff, Shaffren made up the excuse of not liking to demote employees to cover up for the fact that Ms. Burger, the supervisor over the new position for which Plaintiff sought, did not want Plaintiff in her unit. (Keeler Depo., p. 77). According to Plaintiff, Burger did not like Plaintiff and told Shaffren that she did not want Plaintiff in her unit. (Keeler Depo., p. 76). Plaintiff thought Burger was rude, frequently moody, and cussed a lot. (Keeler Depo., pp. 78-79). In the past, Plaintiff had referred to Burger as a "bitch" and thought she was "a fruitcake, mental, and a bitch." (Keeler Depo., pp. 78, 81-82, 83).[4]

According to Plaintiff, her direct supervisor, Harper, began treating her differently after she found out about Plaintiff's meeting with Cain and her request to be transferred out of her unit. Specifically, Plaintiff claims Harper watched her more closely and frequently stood at her desk and asked if she was still working on something which Harper believed should have been finished. (Keeler Depo., pp. 3 1-32). On one occasion, Harper stood over Plaintiff's desk and asked her if she was still working on something. (Keeler Depo., p. 36). When Plaintiff responded "my cases," Harper shouted "Still?" loudly "for everyone in [the] unit to hear." (Keeler Depo, p. 36). Plaintiff testified that other employees were not allowed to help her with her workload, even though it was customary for faster technicians to help complete work of slower technicians. (Keeler Depo., pp. 69-70). Plaintiff also claims that Harper dismissed a letter of commendation written by "Angelo," a supervisor Plaintiff had done work for in another unit. (Keeler Depo., pp. 34-35).

According to Plaintiff, "everyone in [her] unit knew [she] was on . . . the black list . . . [she]

---

[4] According to Plaintiff, Cynthia Titiolo was hired for the Senior Clerk position. (Keeler Depo., p. 63). Plaintiff believes that Titiolo was given the position "because [Titiolo] was in [Plaintiff's] unit and Ms. Harper was picking on her and harassing her to the point where Ms. Titiolo almost wanted to kill herself." (Keeler Depo., p. 63).

was being picked on." (Keeler Depo., p. 36).  Plaintiff believed she was being punished by Harper

for "speaking out against some of the inadequacies in her unit because it was dysfunctional in there

. . . [a]nd punishing [her] because [she] didn't want to be in [Harper's] unit." (Keeler Depo., p. 36).

According to Plaintiff, Cain said that "all of this was happening to [her] because [she] 'stirred the

pot.'" (Keeler Depo., p. 67).

On September 19, 2004, Plaintiff received a performance evaluation. (Keeler Depo., p. Ex.

F). Harper gave Plaintiff all "3's" on a scale of one to five. (Keeler Depo., p. 33; Ex. F).  Plaintiff felt

her evaluation was "a slap in the face because it was - it was neither good, nor bad, it was - it was

effortless." (Keeler Depo., p. 33).  Plaintiff believed Harper's decision to give Plaintiff all "3's" was

an expression of Harper's dissatisfaction with Plaintiff. (Keeler Depo., pp. 192-93).  However,

Plaintiff did not ask any questions about her evaluation or ask why Harper felt she deserved all "3's."

(Keeler Depo., pp. 192-93).

By Plaintiff's own account, her job performance declined in September 2004. (Keeler Depo.,

p. 224). On October 22, 2004, Plaintiff, Cain, and Harper met to discuss the decline in Plaintiff's

performance. (Keeler Depo., pp. 105-106). During the meeting, Cain told Plaintiff that she should

look for another job because she "had only input eight cases," but received fourteen cases that day.

(Keeler Depo., p. 109).  Plaintiff testified that she purposefully chose to only do eight or nine cases

because it afforded her "extra time to get caught up on something else that needed attention," but did

not realize that she should have asked permission to do so. (Keeler Depo., pp. 110-111).  Plaintiff

was also told that she was not allowed to work overtime, for free, or off the clock.  (Keeler Depo.,

pp. 105-106). Later that day, Cain saw Plaintiff leaving work at approximately 4:40, which was forty

minutes after her scheduled departure time. (Keeler Depo., p. 117; Ex. C).

On October 26, 2004, Plaintiff received two written memoranda from Harper. (Keeler Depo., p. 121; Exs. A, B). The first memorandum summarized the "counseling session" held on October 22, 2004 with Cain, Harper and Plaintiff. (Keeler Depo., Ex. A). The memorandum reiterated management's concern that Plaintiff was leaving work "undone on a recurring basis during the past few weeks" and advised Plaintiff that failure to complete the input of assigned cases in a timely manner constitutes "poor performance, inefficiency and could also be negligence." *Id.* The memorandum notified Plaintiff that Harper would be monitoring her performance for a two week period of time to determine whether Plaintiff was completing assigned work. (Keeler Depo., Ex. A).

The memorandum also notified Plaintiff that she should cease working overtime unless approved by her supervisor. *Id.* Plaintiff was warned that "working unapproved overtime constitutes insubordination and [is a violation of] agency policies and procedures and will not be tolerated." *Id.* The memorandum also counseled Plaintiff on sick leave, noting that Plaintiff had been absent for three days or partial workdays during the last thirty days and that she must provide doctor certification before any additional sick time would be approved. (Keeler Depo., Ex. A). The second memorandum from Harper notified Plaintiff that she was not prioritizing her work properly and provided her with a work schedule. (Keeler Depo., p. 124; Ex. B). According to Plaintiff, Harper's memorandum was not "sincere" because she believed Harper should have "encouraged [her]," "been there for [her]," and delivered the message with a "more personal touch." (Keeler Depo., p. 127).

Plaintiff responded to the memoranda in a letter to Harper dated October 26, 2004, which she gave to Cain and Harper on October 27, 2004. (Keeler Depo., p. 155; Ex. D). At the time Plaintiff sent her October 26, 2004 letter, the Senior Clerk position Plaintiff sought was no longer available. (Keeler Depo., p. 158). In the letter, Plaintiff notified Defendant that she suffered from "Attention

6

Deficit Hyperactivity Disorder [ADHD]" and "a mental disability known as Obsessive Compulsive Disorder [OCD]."[5]  (Keeler Depo., p. 155; Ex. D). According to Plaintiff, prior to her October 26, 2004 letter, no one at work knew she had disabilities. (Keeler Depo., pp. 27, 44).  Plaintiff testified that despite her disabilities, she was able to perform certain major life activities on her own, such as taking a shower, brushing her teeth and normal personal grooming. (Keeler Depo., p. 163-164).

As of November 2004, Plaintiff believed that despite her disabilities, she was still capable of doing her job. (Keeler Depo., p. 212).  However, she believed that "an accommodation may have made the difference between [her] still having [her] job and [ ] not having [her] job . . ." (Keeler Depo., p. 212).  Plaintiff testified that she never formally asked for an accommodation or said "I need an accommodation." (Keeler Depo., p. 213). Despite her efforts to keep her employer from discovering her disabilities, she contends Defendant should have known she was disabled because she told them her work was overwhelming her, she was stressed, and because she kept copious notes. (Keeler Depo., p. 202-203).  According to Plaintiff, after she notified Defendant of her disabilities on October 27, 2004, Defendant should have "done something to take a proactive approach in assisting [Plaintiff], rather than, . . . just try[ ] to get rid of [Plaintiff]." (Keeler Depo., pp. 202-203). Plaintiff testified that she "did not want any special treatment. [She] only needed to be rescued . . . [she] needed someone to understand and to just help rescue [her] so that things could be right again. . . ." (Keeler Depo., p. 211).

On November 23, 2004, James H. McHargue, Director of Disability Determinations, sent Plaintiff a letter advising her that the FDOH was considering "suspending or dismissing [her] from

---

[5] Plaintiff testified that she left out of her letter that she also suffered from depression and anxiety. (Keeler Depo., p. 155).

7

[her] position . . . for Poor Performance [ ], Insubordination [ ], Violation of Law or Agency Rules [ ], and Conduct Unbecoming a Public Employee [ ]." (Keeler Depo., Ex. J, p. 1). The letter informed Plaintiff that she had violated agency policy by working overtime and that computer records from the Systems Programmer in the Tallahassee office indicated that Plaintiff had not signed off her computer until 4:25 p.m on October 22, 2004 and that jobs were being performed by Plaintiff on her computer between 4:00 p.m and the time she logged off, which was twenty five minutes later than she should have been working. (Keeler Depo., Ex. J, p. 3). The letter explained that Plaintiff "falsified [her] time entry for October 22, by not logging the 8 ½ hours of actual work. . . . [and that] [i]ntentional falsification of [time records] shall be cause for dismissal in accordance with the Florida Administrative Code." (Keeler Depo., Ex. J, pp. 3-4).

Plaintiff was informed that she could submit a "written or telephonic request for a predetermination conference." *Id.* The conference, which would be "informal," would provide Plaintiff with "an opportunity to make an oral or a written statement, or both, to refute or explain the charges against [Plaintiff]." *Id.* Plaintiff was instructed that if she chose not to participate in the predetermination conference, McHargue would "render [his] decision based upon the information described in th[e] letter and . . . notify [Plaintiff] in writing of [his] decision." (Keeler Depo., Ex. J, p. 4). Plaintiff did not request a predetermination conference. (Keeler Depo., p. 222).

On December 9, 2004, Defendant terminated Plaintiff for poor performance, insubordination, violation of law or agency rules, and conduct unbecoming a public employee. (Keeler Depo., Ex. I). Although offered the opportunity to appeal Defendant's decision, Plaintiff chose not to do so. (Keeler Depo., pp. 218-19; Ex. I, p. 4).

8

*Applicable Standard*

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004) (internal citations omitted*). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24. Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).

*Discussion*

Plaintiff initiated this action against Defendant alleging "retaliation" and "failure to uphold the laws set forth by the [ADA]." (Dkt. 1, p.1). According to Plaintiff, Defendant "conspired to get rid of [her]" after she asked her supervisor for a transfer and reported inadequacies within her unit. (Dkt. 1, p. 2). Plaintiff claims that "denying [her] the transfer was a means of retaliation" and that

9

Defendant terminated her in retaliation for "stirring the pot."    (Dkt. 1, p. 2).

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).    Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A).    In a claim for failure to make reasonable accommodations, the traditional *McDonnell Douglas* burden-shifting is modified. *Fenney v. Dakota, Minn. & E. R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003).  In addition to setting forth the *prima facie* case, Plaintiff must identify a reasonable accommodation that would allow him to perform the job. *Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998).  Once the plaintiff has met this burden, the defendant employer may rebut the claim by presenting evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer. *Id.*

Although neither Plaintiff's Complaint nor her response to the motion for summary judgment clearly set forth her claims, Plaintiff appears to be complaining that Defendant discriminated against her by denying her request for a transfer, which Defendant should have interpreted as a request for an accommodation, and by retaliating against her for requesting a transfer and reporting inadequacies within her unit.

## Discrimination/Failure to Accommodate

To establish a *prima facie* case of employment discrimination or failure to accommodate pursuant to the ADA, a plaintiff must demonstrate that: (1) she has a disability; (2) she is a "qualified individual;" and (3) Defendant unlawfully discriminated against her because of the disability.

10

*D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1225-26 (11th Cir. 2005). A determination of whether a person is disabled is an individualized inquiry performed on a case-by-case basis and "is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999); 29 CFR pt. 1630, App. 1630.2(j).[6]

An individual is "disabled" within the meaning of the ADA when she possesses any one of the following: (1) a physical or mental impairment that substantially limits one or more of the major life activities; (2) a record of such an impairment; or (3) is regarded as having such an impairment. *Id.* § 12102(2). Plaintiff has failed to demonstrate that she had a disability within the meaning of the ADA under any of these three alternative definitions.

*Physical or Mental Impairment that Substantially Limits a Major Life Activity*

Plaintiff has not introduced sufficient evidence to show that she is substantially limited or significantly restricted in any major life activity. A "major life activity" includes "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 CFR § 1630.2(I). The letters submitted by Plaintiff from Dr. Joseph Lupo, Dr. Anthony Duany, and Dr. Umesh Mhatre are inadmissible hearsay. However, even if considered, they merely establish that Plaintiff has been diagnosed with ADHD, OCD, depression, and anxiety and that she has responded well to "all treatments," "medications" and "counseling." (Dkt. 41, Exs. A, B, C ). This evidence falls woefully short of meeting Plaintiff's burden in establishing a disability pursuant to the ADA. *See Toyota Motor Mfg., Inc. v. Williams*, 534 U.S. 184, 198 (2002) ("It is

---

[6] Although the EEOC's administrative interpretations are not binding, they "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986).

insufficient for individuals attempting to prove disability status . . . to merely submit evidence of a medical diagnosis of an impairment. Instead, the ADA requires [that claimants offer] evidence that the extent of the limitation caused by their impairment in terms of their own experience is substantial.") (internal quotations and citations omitted); *see also Pritchard v. Southern Co. Services,* 92 F.3d 1130, 1132 n.3 (11th Cir.1996) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.").

Plaintiff has likewise failed to demonstrate that her individualized condition was severe enough to limit her major life activities. While in her supplemental affidavit (Dkt. 47), Plaintiff attests to having a long history of depression and anxiety disorders, this alone does not establish that at the relevant time period her condition impacted a major life activity. To the contrary, her deposition testimony demonstrates that she is capable of showering, brushing her teeth, and taking care of personal grooming. By her own account, she took daily medications for each of her conditions "which . . . help[ed] [her] to conduct a normal life." (Keeler Depo., Ex. D). As noted, the only medical evidence she offered demonstrates that she responded well to all medical treatment. In her September 17, 2004 email to Cain she represented that she could maintain her current position "for an extended period of time just encase [sic] [Defendant had] an alternative position . . . as opposed to the senior clerk position." (Keeler Depo., Ex. H). Plaintiff testified that as of November 2004, she was still capable of doing her job, but preferred a transfer because the workload was stressful and overwhelming.[7]

---

[7] Plaintiff's testimony concerning her ability to perform her job is somewhat inconsistent. However, even assuming she believed her disabilities prevented her from performing her job, the EEOC regulations state explicitly that the "inability to perform a single, particular job does not constitute a substantial limitation in the major life

*Record of Impairment*

Plaintiff has failed to present any evidence demonstrating a record of impairment. Having a "record" of a qualified impairment means the employee "has a history of, or has been mis-classified as having, a mental or physical impairment that substantially limits one or more major life activities." *Hilburn v. Murata Electronics North America, Inc.,* 181 F.3d 1220, 1229 (11th Cir. 1999) (quoting 29 C.F.R. § 1630.2(k)). To satisfy this definition of disability "the impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities." *Id.* (quoting 29 C.F.R. Pt. 1630, App. § 1630.2(k)). The Eleventh Circuit has held "the record-of-impairment standard is satisfied *only* if [the plaintiff] actually suffered a physical impairment that substantially limited one or more of her major life activities." *Id.* (emphasis supplied). As explained in the preceding section, Plaintiff has failed to establish that her condition meets this standard.

*Regarded as Having an Impairment*

Plaintiff likewise fails to establish that she was "regarded as having an impairment." To prove that Defendant regarded her as disabled, it is not enough for Plaintiff to argue that Defendant knew of her condition because she complained of stress, cried, and took copious notes. *See Sutton,* 185 F.3d at 1209 ("The mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate that the employer regarded the employee as disabled."). Instead, Plaintiff

---

activity of working," rather the impairment must substantially limit either a class of jobs or a broad range of jobs in various classes. *See* 29 C.F.R. § 1630.2(j)(3)(i).

must introduce "substantial evidence" that Defendant *believed* she had a "permanent or long-term impairment." *Id.* ("An employee who is perceived by his employer as having only a temporary incapacity to perform the essential functions of his job is not perceived as 'disabled' as defined by the Act."). On the facts of this record, there is *no* evidence suggesting that Defendant believed Plaintiff was substantially and permanently limited in any of her major life activities. To the contrary, all the record evidence suggests that Plaintiff concealed her disability from Defendant until October 26, 2004 and even then, represented that she was taking daily medications that helped her maintain a "normal life," and that she was capable of continuing in her position for an extended period of time.

Plaintiff, therefore, has failed to produce sufficient evidence from which a jury could find that she is disabled under any of the three alternative definitions provided by the ADA. For this reason alone, Plaintiff has failed to present a *prima facie* case for discrimination and failure to accommodate. [8]

*Failure to Accommodate*

With respect to a failure to her accommodate claim, Plaintiff fails to prove another essential

---

[8] Plaintiff has not pled a disparate treatment claim. She mentions it only in passing in connection with her retaliation claim in her response to Defendant's motion for summary judgment. (Dkt. 41, p. 10). In her supplemental affidavit, she argues for the first time that "many people in the unit had to sneak in extra work to meet the quotas . . . [b]ut only [her] computer was checked, only [her] performance appraisal was changed to probationary, only [her] $1,000 bonus was denied and only [she] was fired." (Dkt. 47, p. 7). Plaintiff's attempt to raise this claim for the first time in response to Defendant's motion for summary judgment is improper. *See Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1286 (11th Cir. 2003) (district court properly decided not to allow the plaintiff to raise a new claim at the summary judgment stage); *Flanigan's Enterprises, Inc. v. Fulton County, Ga.*, 242 F.3d 976, 988 (11th Cir. 2001) (district court properly declined to address the merits of a new claim raised for the first time in response to defendants' motion for summary judgment).
  Nonetheless, even if Plaintiff had properly asserted a disparate treatment claim, she has not stated a *prima facie* case with respect to her claim for the same reasons discussed in the preceding section, namely, she failed to establish she is disabled within the meaning of the ADA.

element, namely, that Defendant was aware of her disability at the time of her request and that her request to be transferred to another position was a reasonable accommodation. *See Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) ("burden of identifying an accommodation that would allow a qualified employee to perform the essential functions of her job rests with that employee, as does the ultimate burden of persuasion with respect to showing that such accommodation is reasonable").

As a matter of law, Defendant cannot be held liable for violating the ADA for not providing a reasonable accommodation unless it knew of Plaintiff's disability or limitations. *See Fussell v. Georgia Ports Authority,* 906 F. Supp. 1561, 1569 (S.D. Ga.1995) (citing *Miller v. National Cas. Co.,* 61 F.3d 627, 629 (8 th Cir.1995)). Under the ADA, a plaintiff must show that her employer had knowledge of the limitation and the need to accommodate it before it failed to make a reasonable accommodation. *Cheatwood v. Roanoke Industries,* 891 F. Supp. 1528, 1538-39 (N.D. Ala.1995). The burden is on the non-obviously disabled plaintiff to timely alert the employer of her claimed disability and thus afford the employer an opportunity to make a reasonable accommodation. *Id.; see also Reed v. LePage Bakeries Inc.*, 244 F.3d 254, 260-61 (1st Cir. 2001) ( The ADA imposes liability on an employer for "not making reasonable accommodations to the *known* physical or mental limitation" of an employee); *Rogers v. CH2M Hill, Inc.*, 18 F. Supp. 2d 1328, 1334 (M.D. Ala. 1998) (recognizing importance of notice by the employee, especially when employee suffers from non-obvious mental disabilities).

"Because an employee's disability and concomitant need for accommodation are often not known to the employer until the employee requests an accommodation, the ADA's reasonable accommodation requirement usually does not apply unless 'triggered by a request' from the

employee." *Reed,* 244 F.3d at 260-61 (citations omitted). The employee's request must be "sufficiently direct and specific," giving notice that she needs a "special accommodation" and the request must explain how the accommodation requested is linked to her disability. *Id.* "The employer has no duty to divine the need for a special accommodation where the employee merely makes a mundane request for a change at the workplace." *Id.* (citations omitted).

Plaintiff testified that at the time she asked for a transfer, she had not disclosed to anyone at work that she was disabled. Nor did she notify Defendant that she required a transfer because of her limitations. Plaintiff's vague references to feeling stressed by an unmanageable workload that according to her, everyone suffered from, are insufficient to put Defendant on notice that she was requesting an accommodation due to her ADHD or OCD condition. *See Reed,* 244 F.3d at 262 (no duty to provide accommodation where plaintiff gave no notice of the aspect of her illness relevant to the accommodation she sought); *Rogers,* 18 F. Supp. 2d at 1335 ("[v]ague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the ADA"). Nothing in the record indicates that Plaintiff's disability prevented her from making an adequate request for an accommodation. To the contrary, Plaintiff's testimony suggests that she deliberately concealed her condition from her employer until October 27, 2004, a month after she was counseled for poor performance and violations of the overtime policy, and after the position she sought had been filled.

Even after Plaintiff put Defendant on notice of her ADHD and OCD condition, Defendant had no duty to accommodate Plaintiff unless her request for a transfer was reasonable. Plaintiff fails to demonstrate that her request for a transfer to a lower position was a reasonable accommodation. While, in appropriate situations an employee's "reassignment to a vacant position" may qualify as

16

a reasonable accommodation, it is Plaintiff's burden to show the alternative position was both vacant and one for which she was "qualified." *See Prichard v. Domiguez,* 2006 WL 1836017, *13 (N.D. Fla. June 29, 2006 ) (citing *Reed v. Heil Co.,* 206 F.3d 1055,1062 (11th Cir. 2000)) ("Reassignment is only a reasonable accommodation if a position for which plaintiff is qualified is available;" holding plaintiff failed to establish a *prima facie* case because he failed to demonstrate that he was "qualified" for other vacant positions). Plaintiff has failed to demonstrate that she was qualified for the senior clerk position, which by her own account was not available at the time she disclosed her disabilities. Neither has Plaintiff established that she was qualified for any other available vacant positions. Where as here, "a plaintiff cannot demonstrate 'reasonable accommodation,' the employer's lack of investigation into reasonable accommodation is unimportant." *Earl*, 207 F.3d at 1367 (citing *Wilis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997)). Accordingly, Plaintiff fails to establish a *prima facie* case for failure to accommodate.

**Retaliation**

The ADA states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). To establish a *prima facie* case of retaliation under the ADA, a plaintiff must show that (1) she participated in a statutorily protected activity or expression; (2) she suffered an adverse action; and (3) the adverse action was related to the protected activity. *Albra v. City of Fort Lauderdale,* 232 Fed. Appx. 885, 891, 2007 WL 1213230, 5 (11th 2007) (citing *Shotz v. City of Plantation, Fla.,* 344 F.3d 1161, 1180 (11th Cir. 2003)).

Plaintiff has failed to demonstrate that she engaged in any statutorily protected activity and

in turn, fails to establish a *prima facie* case of retaliation.   ADA retaliation claims are assessed under the same framework used for retaliation claims under Title VII.   *See Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1328 (11th Cir. 1998) (citations omitted).   Therefore, to establish that the plaintiff engaged in "statutorily protected activity", it is sufficient that she have a "good faith, objectively reasonable belief that h[er] activity [was] protected by the statute." *Id.* (citing *Clover v. Total Sys. Servs., Inc.,* 157 F.3d 824, 827 (11th Cir.1998)) (employee claiming retaliation for opposing employer's conduct must have good faith, objectively reasonable belief that such conduct was unlawful under Title VII); *Sherrod v. American Airlines, Inc.,* 132 F.3d 1112, 1122 (5th Cir. 1998) (employee claiming retaliation for filing EEOC complaints had reasonable belief that employer violated the ADA and ADEA).

Here, Plaintiff claims she was retaliated against because she "confid[ed] to . . . [   ] Cain . . . that she and others were stressed because they had to put in more than 8 hours each day to meet the production quotas set by management" (Dkt. 41, p. 3) and for "Stirring the Pot"   (Dkt. 1, p. 2). According to Plaintiff, Cain told her "all this was happening to [her] because she 'stirred the pot,'" which Plaintiff interpreted as meaning her reporting the inadequacies in the unit and requesting a transfer. (Keeler Depo., p. 67).   Reporting stressful work conditions to management is not a protected activity.   Nor could Plaintiff have reasonably believed that such conduct was unlawful under the ADA, as it bore no relation to her alleged disability or any conduct proscribed by the ADA.

Even reading Plaintiff's allegations liberally and viewing the evidence in the light most favorable to her, this Court cannot conclude that her request for a transfer, which she contends constituted an accommodation, constituted "statutorily protected activity." As discussed in the preceding section, Plaintiff failed to identify a reasonable accommodation.   For many of the same

18

reasons, she fails to demonstrate that she had a good faith, objectively reasonable belief that she was entitled to the accommodation under the ADA. Plaintiff has not produced any evidence that, at the time that she requested a transfer, her belief that she was disabled was objectively reasonable.

As discussed previously, the mere existence of a physical impairment does not constitute a disability under the ADA. The impairment must substantially limit a major life activity. *Standard*, 161 F.3d at 1128-29 (citing *Gordon v. E.L. Hamm & Assoc., Inc.,* 100 F.3d 907, 911 (11th Cir. 1996)). In determining whether an injury substantially limits a major life activity, courts consider "(1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." *Id.* (citing 29 C.F.R. § 1630.2(j)(3)(I)). Plaintiff has not introduced *any* evidence that her doctors, or anyone else, gave her reason to consider her ADHD or OCD as impairing her ability to work in a long term or permanent way. In fact, she believed she could perform her job well, she felt with medication she lived a "normal life," and her doctors reported that she responded well to medications and treatment.

In summary, Plaintiff has not introduced any evidence that would allow a rational fact finder to conclude that she was objectively reasonable in believing that she was disabled pursuant to the ADA or that her request for a transfer was a reasonable accommodation pursuant to the ADA. She has failed, therefore, to establish that she engaged in "statutorily protected activity" and in turn, she failed to establish the first element of her *prima facie* case of retaliation. *See e.g. Talanda v. KFC Nat'l Management Co.,* 140 F.3d 1090, 1096-97 (7th Cir.1998), *cert. denied,* 525 U.S. 869, 119 S.Ct. 164, 142 L.Ed.2d 134 (1998)(affirming summary judgement for defendant when plaintiff's belief that employee was disabled, as defined by the ADA, was not reasonable). Accordingly, it is

**ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment (Dkt. 31) is **GRANTED**.  This case is **DISMISSED**.  The Clerk is directed to enter judgment in favor of Defendant and against Plaintiff.  The Clerk is further directed to deny all pending motions as moot and close this case.

**DONE AND ORDERED** in chambers this ___5^th___ day of June, 2008.

JAMES D. WHITTEMORE
United States District Judge

Copies to:
Counsel of Record
Plaintiff, *pro se*

20